UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARIA ORTIZ,                          )
                                      )
            Plaintiff,                )
                                      )   CIVIL ACTION NO.
        v.                            )   13-12793-DPW
                                      )
CAROLYN W. COLVIN, ACTING             )
COMMISSIONER OF SOCIAL                )
SECURITY ADMINISTRATION,              )
                                      )
            Defendant.                )

MEMORANDUM AND ORDER
July 30, 2015

**I. BACKGROUND**

Maria M. Ortiz instituted this action under 42 U.S.C.
§ 405(g) seeking review of the decision of the Security
Administration denying her social security disability benefits.
She contends that the Commissioner erred by undue reliance on
state agency reports as to her residual functional capacity and
by failing adequately to consider subjective evidence of pain.

**A.   *Medical Chronology***

Ms. Ortiz was born on September 22, 1966.  At the time she
applied for disability benefits, she was 43 years old. An
Administrative Law Judge of the Social Security Administration
determined that the date Ms. Ortiz was last insured was December
31, 2014.  She was consequently required to show an existing

1

disability on or before that date in order to receive social
security disability benefits.

Ms. Ortiz sought medical attention beginning in 2009 due to
rotator cuff surgery on the left arm, bicep surgery on the left
arm, and tendonitis on the right arm. On December 21, 2009, she
visited her physician Dr. Christiano with complaints of pain in
her left leg after slipping on ice outside her workplace.  An x-
ray showed no signs of fracture or arthritis and the doctor
assessed the origin of her pain to be hamstring strain. He
recommended physical therapy and a two-week absence from work.

Between January 2010 and March 2012, Ms. Ortiz visited a
number of doctors and hospitals complaining of a variety of
ailments. On January 20, 2010, Ms. Ortiz visited the emergency
department due to right elbow pain, which the doctor diagnosed
as tendonitis. One week later Ms. Ortiz received a cortisone
injection to her right elbow after injuring her elbow while
working at Dunkin Donuts.  On February 22, 2010, she saw Dr.
Christiano because of a pain in her left shoulder and right arm.

On March 17, 2010, Dr. Laguarda diagnosed Ms. Ortiz with
severe decompensated of diabetes (decompensated diabetes
mellitus is a disease in which blood sugar levels cannot be
corrected by means of drugs, resulting in development of severe
damage to many of the patient's systems and internal organs)

2

after she had been found unresponsive in her apartment and brought to the hospital.  At a follow-up visit on April 2, 2010, the doctor noted that Ms. Ortiz was correcting her diabetes with insulin.  One week later Ms. Ortiz saw Dr. Rapa who noted that she had responded very well to the intensive care unit insulin, that her blood sugar levels were controlled, that she was "not disabled" and that she was "able to work without restrictions".

On April 13, 2010, Ms. Ortiz visited Dr. Christiano again, complaining of pain in both shoulders.  On April 21, she checked into the emergency department because of an abscess on her thigh and gout in her foot.

One week later, on April 27, 2010, Ms. Ortiz saw Dr. Hentoff who noted that she had developed signs of depression due to the fact that the restaurant where she had been working had been closed and she had been unable to find another job.  During the visit she acknowledged increased alcohol use after the loss of her job, but said that she had maintained sobriety for the previous 2-1/2 months.  She also described her daily routine activities to Dr. Hentoff: getting up between 6:30 and 7:00 am, having breakfast and showering independently, going for a walk, searching for jobs or going to doctor's appointments, having lunch, followed by another walk in the afternoon, resting and going to bed at around 9:00 pm.  The doctor diagnosed Ms. Ortiz

with major depressive disorder and appraised her Global
Assessment of Functioning score at 55, (a scale from 0 to 100
where higher scores indicate greater levels of functioning),
which lies in the moderate range.

The day after her visit to Dr. Hentoff, Ms. Ortiz went to
the hospital and was treated for nausea and vomiting, and she
returned the next morning at 3:00 a.m. because of pain in her
chest.  On May 11, 2010, Ms. Ortiz visited Dr. Gottlieb to begin
treatment for diabetes.  When she went to see Dr. Rapa one week
later she did not have any symptoms.

On May 23, 2010, Ms. Ortiz visited the emergency department
because of pain in her left foot, but the provider noted that
the pain was of unclear etiology and that she exhibited no signs
of swelling or warmth in her left foot, whether through visual
examination or x-ray.  When she developed vomiting, nausea, and
a poor appetite a few days later, a colonoscopy revealed that
Ms. Ortiz suffered from gastritis.

On June 24, 2010, Ms. Ortiz saw Dr. Gottlieb, who noted
that she continued to experience pain in her right shoulder and
that her memory was not as sharp as it had been before.  In
August 2010, Dr. Rapa opined that Ms. Ortiz was doing well and
that she had good control of her diabetes.  Meanwhile, Dr.
Christiano found mild degenerative changes in her right elbow

and no abnormal findings as to possible fractures or
dislocations in her right shoulder when he examined her.
Images of Ms. Ortiz's gastrointestinal tract revealed that she
still suffered from gastritis in September 2010, four months
after the condition had first been diagnosed.  On April 14,
2011, Ms. Ortiz was admitted to the hospital for diarrhea, but
the report left the question of etiology open, although it also
diagnosed macrocytic anemia (a condition where the red blood
cells are too large and too few, and cannot carry enough oxygen,
thus making the person feel tired much more easily) in the
setting of alcohol use and acute renal failure.  The report also
noted that the two colonoscopies Ms. Ortiz had undergone had
both revealed colitis and a persisting moderate gastritis, a
diagnosis that was affirmed when she was admitted to the
hospital for abdominal pain on May 6, 2011.  The report for the
latter date notes that Ms. Ortiz appeared obese, and that she
denied using alcohol.  She was discharged three days later with
instructions to "[s]top drinking alcohol" and to "[a]void dairy
products while having diarrhea".

On September 27, 2011, Ms. Ortiz saw Dr. Gottlieb to
complain of discomfort in her left eye and chest pressure while
walking, and the doctor found her diarrhea to be well-controlled
through the medication she had received.

Gallbladder problems were first discovered when Ms. Ortiz visited the hospital with pneumonia and abdominal pain on December 9, 2011. A few days later providers placed a stent in her bile duct to address a potential stone, and on December 28, 2011, Ms. Ortiz visited the emergency room due to abdominal pain resulting from tiny gravel in the gallbladder and a thickening of the gallbladder wall.

On January 8, 2012, Ms. Ortiz went to the emergency room due to a numbness in her hands.  On January 22, 2012, she was hospitalized due to pain in her arms and legs, for which providers noted that she had a history of pancreatitis, attributable to alcohol abuse.  When she returned with severe dehydration the day after her release Ms. Ortiz admitted to having had one shot of hard liquor before going to bed, but maintained that she had been largely sober for the previous two months.

On February 21, 2012, Ms. Ortiz was again admitted to the hospital with gastrointestinal complaints, for which providers could determine no clear etiology, apart from noting a possible cirrhosis connection.  On March 20, 2012, Ms. Ortiz saw Dr. Gottlieb and claimed that she had been diagnosed with liver cirrhosis.  On subsequent examination, Dr. Gottlieb only found a slight tenderness on her liver edge.

6

State agency reports were divided into two parts; an
assessment of Physical Residual Functional Capacity and a
Psychiatric Review Technique.  In June 2010, Dr. Poirier noted
on the Physical Residual Functional Capacity Form that Ms. Ortiz
had rotator cuff repair, gout and diabetes.  He opined that Ms.
Ortiz could occasionally lift and/or carry 20 pounds, frequently
lift and/or carry 10 pounds, stand and/or walk for a total of
about 6 hours in an 8-hour workday, sit for a total of about 6
hours in an 8-hour workday and push and/or pull with no
limitations other than what was shown for lift and/or carry.
With respect to postural limitations, Dr. Poirier found that Ms.
Ortiz could climb ramps and stairs frequently, climb ladders,
ropes and scaffolds only occasionally, balance, stoop, kneel and
crouch frequently, but crawl only occasionally. The assessment
was affirmed by Dr. Faigel.

Dr. Cox, the doctor responsible for the Psychiatric Review
Technique, found that Ms. Ortiz did not suffer from a severe
mental health impairment in June 2010.  Dr. Garrison affirmed
this assessment.  The state agency reports classified Ms. Ortiz
as able to perform light work.

**B.   *Procedural History***

Ms. Ortiz filed applications for disability benefits in
March 2010, alleging an inability to work since December 21,

2009.  The Social Security Administration denied the applications first on June 7, 2010, and on reconsideration on October 25, 2010.  Following Ms. Ortiz's written request, a hearing was held before an ALJ on April 10, 2012.  In addition to Ms. Ortiz, a vocational witness, James Cohen, also testified at the hearing.  Mr. Cohen, while opining that Ms. Ortiz could perform sedentary work, conceded that she could not do so if medical difficulties resulted in frequent absenteeism.

On May 25, 2012, the ALJ found that Ms. Ortiz did not have a disability that met the required standards and was thus not entitled to disability benefits.  The ALJ found specifically that Ms. Ortiz had insulin dependent diabetes mellitus, degenerative joint disease of the upper extremities, colitis, gallbladder disease, and depression. The ALJ also found that Ms. Ortiz, although treated for degenerative changes in the shoulders and right elbow, remained capable of performing fine and gross movements.  He ultimately found that she was capable of sedentary work for which jobs exist in significant numbers.

The Appeals Council denied Ms. Ortiz's request for review on September 6, 2013, making the ALJ's decision the final decision of the Commissioner in this case.  On April 4, 2014, Ms. Ortiz filed this action appealing that decision.

8

**C.   *Standard of Review***

1.   The administrative evaluation protocol

Social Security regulations provide a five-step sequential evaluation to determine whether an individual is entitled to SSDI and SSI benefits.   20 C.F.R. § 404.1520; see *Goodermote* v. *Sec'y of Health & Human Servs.*, 690 F.2d 5, 6–7 (1st Cir. 1982). Under 20 C.F.R. § 404.1520, if at any step there is a clear determination that a claimant is disabled or not disabled, the evaluation process can be concluded.   If, however, a clear determination is not possible, the next step needs to be addressed. 20 C.F.R. § 404.1520(a).   The claimant bears the burden of proof on the first four steps, and the agency bears the burden on the last step.   *Blackette* v. *Colvin*, 52 F. Supp. 3d 101, 110 (D. Mass. 2014).   The evaluation process addresses the following questions:

First, is the claimant currently working and is that work a substantially gainful activity? If so, the claimant is considered not disabled.   20 C.F.R. § 404.1520(a)(i).

Second, does the claimant have a severe medically determinable physical or mental impairment that meets the duration requirement under 20 C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement?  If not, the claimant is not disabled. 20 C.F.R. §

404.1520(a)(ii).  A "severe impairment" is defined as an impairment "which significantly limits [the claimant's] physical or mental capacity to do basic work activities."  20 C.F.R. § 404.1520(c).

Third, does the claimant's impairment meet the duration requirement and meet or equal an impairment on the list of impairments in Appendix 1 to the Social Security Regulations? If so, then the claimant is disabled.  20 C.F.R. § 404.1520(a)(iii).

Fourth, can the claimant still do her past relevant work? If yes, then the claimant is not disabled.  20 C.F.R. § 404.1520(a)(iv).

Fifth, can the claimant make an adjustment to other work considering her residual functional capacity, age, education, and past work experience? If not, the claimant is considered disabled. 20 C.F.R. § 404.1520(a)(v).

### 2.  Judicial review of the administrative decision

Judicial review of an ALJ's decision to grant or deny disability benefits explores whether the final decision is supported by substantial evidence and whether the correct legal standard was used.  42 U.S.C. § 405(g); *Ward* v. *Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  Questions of law are reviewed de novo.  *Seavey* v. *Barnhart*, 276 F.3d 1, 9 (1st Cir.

2001); *Brown* v. *Apfel*, 71 F.Supp.2d 28, 30 (D.R.I.1999), *aff'd*, 230 F.3d 1347 (1st Cir. 2000).  On judicial review of a disability determination, a court "is limited to determining whether the [administrative law judge] deployed the proper legal standards and found facts upon the proper quantum of evidence." *Nguyen* v. *Chater*, 172 F.3d 31, 35 (1st Cir. 1999).

The Commissioner's factual findings are held to be conclusive so long as they are supported by substantial evidence and the Commissioner has applied the correct legal standard. 42 U.S.C. § 405(g); *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner and her designee, the ALJ, are responsible for drawing permissible inferences from evidentiary facts and resolving issues of credibility.  *Rodriguez* v. *Celebrezze*, 349 F.2d 494, 496 (1st Cir. 1965).

A district court has the power to enter judgment "affirming, modifying, or reversing" a decision of the Commissioner of the Social Security Administration ("SSA") with an optional remand of the cause for a new hearing.  42 U.S.C. § 405(g).

There is no dispute that the ALJ, in reaching his decision, applied the five-step sequential evaluation required by 20 C.F.R. § § 404.1520 and 416.920.  In his decision, the ALJ found

that Ms. Ortiz had not engaged in any substantial gainful
activity since December 21, 2009, the date she alleged her
disability began.   The ALJ also found that Ms. Ortiz's insulin-
dependent diabetes mellitus, degenerative joint disease of the
upper extremities, gallbladder disease, and major depression are
severe impairments.   At step three of the evaluation process,
the ALJ found that Ms. Ortiz's condition did not meet or equal
the clinical requirements of an impairment in Appendix 1, and
that Ms. Ortiz's depression only resulted in mild limitations in
her activities of daily living, mild difficulties with social
functioning, but moderate limitations in concentration,
persistence or pace. (R 20-12).   The ALJ accepted the vocational
expert's conclusion that, given her limitations, Ms. Ortiz could
still perform the requirements of a telephone operator (3200
jobs in Massachusetts), telemarketer (4900 jobs in
Massachusetts) and surveillance system monitor (2070 jobs in
Massachusetts).

## II. DISCUSSION

Ms. Ortiz makes two main arguments.   First, she contends
that the ALJ's residual functional capacity finding at step four
of the sequential evaluation is inadequate and should be
rejected.   Second, she argues that the ALJ's determination at

12

step five that her reports of pain were not fully credible was
similarly flawed.

## A.   *Determining residual functional capacity*

It bears reemphasizing in this context that the ALJ is the
finder of fact and is responsible for drawing permissible
evidentiary facts and resolving issues of credibility.
*Rodriguez*, 349 F.2d at 496.  Upon review, the court must uphold
the ALJ's findings "if a reasonable mind, reviewing the evidence
in the record as a whole, could accept it as adequate to support
his conclusion." *Rodriguez* v. *Sec'y of Health & Human Servs.*,
647 F.2d 218, 222 (1st Cir. 1981).

The state agency's examiners reports classified Ms. Ortiz
as being able to perform light work; the ALJ reduced this
classification to a finding that Ms. Ortiz was able to perform
sedentary work.  Nevertheless, Ms. Ortiz argues that the ALJ
erred when taking the state agency's examiners reports into
account without reservations because additional evidence was
introduced after their reports had been compiled.  Further, she
complains that the ALJ only devoted half a page of his opinion
to the discussion of the claimant's credibility and the evidence
that supported his RFC finding, and that the ALJ failed to
"provide any explanation of the weight that he gave to the
medical opinion evidence."

There is no set limit as to how long an ALJ's explication must be.  Of course the decision should be extensive enough to cover the most relevant reasons for the ALJ's determination, however long that may be for any individual case.  Here, the ALJ spent about half a page reciting the state agency medical opinions and his own, more favorable evaluation; two pages on why the claimant's impairments or combination of impairments do not meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1; and one page to justify his finding that Ms. Ortiz had a residual functional capacity to perform sedentary work "that involves performing simple, routine and repetitive tasks."  Upon review of the tightly organized and concisely stated nine page discussion of her case by the ALJ, I cannot say this was categorically inadequate because of its length.  Of more importance is the quality of the analysis, to which I now turn.

1.   Conventional Residual Functional Capacity
     Determination

Ms. Ortiz contends that the ALJ should have disregarded the state agency opinions because of subsequent evidence.  She argues that the ALJ based "his [residual functional capacity] finding only on his lay interpretation of the medical evidence"

and improperly substituted "his lay judgment for that of the medical experts."

Judicial review turns on the question whether there is substantial evidence in the record; evaluation by a medical expert may be required if the issue reaches a certain level of complexity of impairment such that it cannot be properly evaluated by a lay person.  Some courts have held that an expert's residual functional capacity evaluation is required where "the record . . . is sufficiently ramified that understanding it requires more than a layperson's effort at a commonsense functional capacity assessment."  *Manso-Pizarro*, 76 F.3d at 19; *Roberts* v. *Barnhart*, 67 F. App'x 621, 623 (1st Cir. 2003).  The argument seems to turn on whether the ALJ's determination is valid or invalid due to the lack of evidentiary foundation and expert guidance that is usually provided through a medical examiner's evaluation.

This problem is reflected in case law which includes holdings such as that particular ALJ's comparison of the demands of claimant's past work with her mental functional capacity when based on an invalid residual functional capacity assessment, could not be found supported by substantial evidence, *see Roberts*, 67 F. App'x at 623, and that "[u]nless the sequelae of a claimant's impairments are obvious to a layperson as a matter

15

of common sense, an administrative law judge is not qualified to
determine [residual functional capacity] on the basis of the raw
medical evidence but instead must look to a medical expert to do
so." *Staples* v. *Astrue*, 2010 WL 2680527, at *2 (D. Me. June 29,
2010).

In the case of Ms. Ortiz's medical history, the record
demonstrates that the reasons for her ailments and pain were
often not apparent even to her treating physicians, both at the
hospitals she visited and her private practice physicians.  As
described above, the words "no clear etiology" appear on her
medical reports and other records quite frequently.  In such a
case, where the medical experts are often not able to point to
the source of the patient's pain, the patient's health situation
is presumably too complex to allow the ALJ to make a meaningful
judgment as a lay person.  Thus, the ALJ's finding must
necessarily be guided by expert medical determination of the
claimant's residual functional capacity.

Here, the ALJ had the benefit of medical opinions by
examining medical experts, Dr. Poirier and Dr. Cox, whose
opinions were affirmed by Dr. Faigel and Dr. Garrison.  Ms.
Ortiz, of course, disputes the validity of these state agency
medical opinions themselves.  She argues they failed to take the

entirety of the record into account and can thus not provide a
sufficiently informed evaluation.

The Practice and Procedure Database for Social Security
Disability Claims explains that two of the possible ways to
argue that a state agency doctor's opinion is entitled to little
or no weight are to show that the physician's opinion was based
on only a portion of the record now available, or that the
physician's opinion is now stale because it was based on
evidence which has been superseded by new evidence.  3 Soc. Sec.
Disab. Claims Prac. & Proc. § 25:55 (2nd ed.).  Ms. Ortiz seems
to be undertaking such a showing when she argues that the state
agency evaluations are inadequate because the physicians and
psychologists "based their opinions on a materially incomplete
medical record [and] reviewed only a relatively small portion of
the overall medical record."

While Ms. Ortiz is correct that the ALJ is under an
obligation to take the complete record into account, she fails
to identify any specific points in the record that would
contradict the ALJ's finding or that of the state agency
opinions relied upon by the ALJ.

If she means to refer to the fact that the state agency
opinions are dated June 2010, when the whole medical record
continued to be developed through March 2012, I do not believe

17

that chronology undermines those decisions in this setting.  Ms.
Ortiz claimed that her disability began in December 2009 and
that she was completely unable to do substantially gainful work
at that point.  Yet for purposes of this argument, she appears
also to contend that at the time the state agency evaluations
were conducted in June 2010, she was not yet disabled enough and
that the ALJ should have had later state evaluations conducted.
This argument is contradicted by her own claims.

In any event, as my colleague Judge Casper has observed, an
ALJ "may rely on older evidence when the information in that
evidence remains accurate."  *Abukar* v. *Astrue*, 1:11-CV-10456-
DJC, 2012 WL 957623, at *12 (D. Mass. Mar. 21, 2012).

Simply because the ALJ rejected Ms. Ortiz's testimony that
she was too disabled to work, does not establish that he relied
too heavily on the state agency experts.  Given his modification
of the state agency opinions by finding a greater level of work
limitations than they did, the ALJ cannot be said to have
adopted the state agency opinions without reservation or
refinement.  *See generally Rodriguez*, 647 F.2d at 224.  The
ALJ's finding that Ms. Ortiz could perform sedentary work
represents a more favorable classification of her abilities than
being able to perform light work, as the state agency opinions
concluded.

The ALJ's finding regarding Ms. Ortiz's residual functional capacity to work is supported by substantial evidence in part because the record demonstrates that she was able to take care of her personal everyday needs.  *See Blackette,* 52 F. Supp. 3d at 120-21.  The questionnaires filled out by Ms. Ortiz show that she was able to walk for 30 minutes every day with a 5 minute break every 15 minutes, clean her house and cook her own meals (although she claimed it took her between 30 and 60 minutes to make a sandwich).  On a questionnaire from April 1, 2010, she reported that she lived alone, although she has gotten married since then.  For the household chores that she was able to perform without help she listed cleaning every day and ironing once a week.  She also said she drove to stores and went shopping for clothes and groceries there.  She said she was able to handle her money independently as well.  Moreover, she said she was able to interact with others via phone and computer and go to church on Sundays.  The ALJ's finding that Ms. Ortiz could perform work at the sedentary level is supported by substantial evidence in the record.  I recognize that determining the precise extent of Ms. Ortiz's limitations was made more difficult because she did not provide a number of details on the questionnaires and left quite a few fields blank.

But the ALJ's ultimate conclusion is supported.  The ALJ
satisfactorily examined the evidence provided.

An illustration of the principles of deference that frame
judicial review of an ALJ's determination is found in another
case where comparable limitations to those of Ms. Ortiz were
presented.  *Escobar* v. *Colvin*, 2014 WL 1159822 (D. Mass. Mar.
20, 2014).  There Magistrate Judge Dein noted that: "The
plaintiff's assertion that her physical impairments met or
equaled a listed impairment is also undermined by evidence from
the state agency physicians that Escobar retained the physical
RFC to perform light work."  *Id.* at *15.  Doctors had found

> no limitations had been established in Escobar's ability
> to hear or speak.  Escobar retained the capacity to lift
> 20 pounds occasionally and 10 pounds frequently; to
> stand and/or walk for about 6 hours in an 8 hour work
> day; and to sit for about 6 hours in an 8 hour work day;
> had no limitations on her ability to push and/or pull;
> could occasionally crawl, crouch, kneel, stoop, balance,
> and climb ramps and stairs; could never climb ladders,
> ropes or scaffolding; had no manipulative or visual
> limitations; and should avoid concentrated exposure to
> extreme cold, noise, vibrations, fumes, and hazards such
> as machinery and heights.

*Id.* at 15.

These described limitations are similar to those of Ms.
Ortiz and thus a comparison supports a general finding
classifying her as not disabled.  *See also Rodriguez*, 647 F.2d
at 221 (holding that a plaintiff's impairments, comparable to

those of Ms. Ortiz, were not of sufficient severity to warrant a finding of disability).

One specific factor for consideration when evaluating a claimant's ability to find other work — once it has been determined that she is unable to perform her previous work, but is able to perform other work in the economy — is the claimant's age.  One doctor's report from April 30, 2010, mentions that Ms. Ortiz looked "older than her chronological age."  When taking this circumstance in combination with the fact that her work experience was in food service, and that has never worked in the jobs recommended by the vocational expert — a telephone operator, a telemarketer, or a surveillance system monitor — the record might suggest it would be harder for her to successfully obtain employment.  Here again, however, the ALJ's determination that Ms. Ortiz "is capable of making a successful adjustment to other work" is entitled to deference.

If the claimant is a younger person, defined as under age 50, the Social Security Administration considers the claimant's ability to adjust to other work not to be too negatively affected by the claimant's age.  Under certain circumstances the Medical-Vocational Rules recognize that claimants of age 45-49 will be more limited in their ability to adjust to other jobs with new requirements than people who are younger than age 45.

20 C.F.R. § 404.1563(c).  This analysis will first look at the grid for sedentary work because the ALJ determined that Ms. Ortiz was limited to performing that kind of work.  Since the medical examiners judged Ms. Ortiz to be able to perform work at the light work level, the analysis might then go on to examine her disability status under the respective guidelines for light work for matters of completeness.

Ms. Ortiz has argued that the ALJ was not authorized to find greater limitations than those set forth in the state agency reports and thus substituted his lay judgment for the opinions of experts.  This argument is unconvincing because on this record it is essentially arguing that the ALJ's mistake was that he decided more favorably to her than the state agency opinions.  There is no reversible error when an ALJ gives a claimant the benefit of the doubt.  *MacFarlane* v. *Astrue*, 2008 WL 660225 (D. Me. Mar. 5, 2008).  Of course, Ms. Ortiz contends for a classification of being unable to do no work at all.  But that result would also differ from the expert's testimony and similarly ask the ALJ to substitute his own lay judgment for the opinion of experts when deciding to accept her testimony over the evaluation of licensed professionals.  The ALJ's decision must be informed by expert opinions but it need not embrace them in their entirety.

At the date Ms. Ortiz's disability allegedly began, on December 21, 2009, she was 43 years old.  At that time, she fell in the category of "younger individual age 18-44", and later "younger individual age 45-49" of the "Maximum Sustained Work Capability Limited to Sedentary Work as a Result of Severe Medically Determinable Impairment(s)"-grid of the Social Security Administration for determination of an individual's ability to find work in the economy.  20 C.F.R. Pt. 404, Subpt. P., App. 2 §§ 201.00. She also has a high school education and thus falls into the category of "high school graduate or more," and her skill level is "skilled or semi-skilled — skills not transferable" because she can no longer perform the tasks required of a food service manager.  Thus, she would be judged to have been not disabled in both age groups 18-44, 20 C.F.R. Pt. 404, Subpt. P., App. 2 §§ 201.27, and 45-49, 20 C.F.R. Pt. 404, Subpt. P., App. 2 §§ 201.21, since there are still a number of jobs in the economy for this group.  20 C.F.R. Pt. 404, Subpt. P., App. 2 §§ 201.00.

When looking to the same categories in the "Maximum Sustained Work Capability Limited to Light Work as a Result of Severe Medically Determinable Impairment(s)"-grid, one could also reach a classification as not disabled. 20 C.F.R. Pt. 404, Subpt. P., App. 2 §§ 202.20.

23

Usually, where the Medical-Vocational Rules grid of 20 C.F.R. Pt. 404, Subpt. P., App. 2 establish that a significant number of jobs exist in the economy, the Commissioner does not have to rely on evidence of specific jobs available to the claimant in the economy to satisfy his burden under step five of the evaluation. *Perbeck* v. *Astrue*, 487 F. Supp. 2d 1267, 1273 (D. Kan. 2007); *Ortiz* v. *Sec'y of Health & Human Servs.*, 890 F.2d 520, 526 (1st Cir. 1989); 20 C.F.R. Part 404, Subpart P, App. 2; *see also Pratts* v. *Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

The ALJ here correctly determined that if a claimant in a social security disability benefits case has nonexertional impairments which significantly limit the range of work permitted by her exertional limitations, then the Commissioner cannot rely upon the grids, and instead must consider the testimony of a vocational expert or other similar evidence that jobs exist in the economy which claimant can obtain or perform. *Johnston v. Barnhart*, 378 F. Supp. 2d 274, 283 (W.D.N.Y. 2005). The ALJ here satisfied this requirement because he accepted testimony by the vocational expert that there are at least three job categories that Ms. Ortiz could still perform: the job of a telephone operator for which there are 3200 jobs in Massachusetts with 432,000 jobs in the national economy, a

telemarketer for which there are 4900 jobs in Massachusetts with 408,000 jobs in the national economy and a surveillance system monitor for which there are 2070 jobs in Massachusetts with 997,000 jobs in the national economy.  This finding was sufficient since it establishes that there would be a significant number of jobs that Ms. Ortiz could perform.

Ms. Ortiz has several nonexertional impairments, as found by the examiners and recognized as a matter of fact by the ALJ: mild depression, a number of postural limitations such as the fact that while she was found to climb ramps and stairs and balance, stoop, kneel and crouch frequently, she could climb ladders, ropes and scaffolds and crawl only occasionally, and had moderate difficulties with regard to concentration, persistence and pace.  Since these nonexertional impairments exist despite their relatively mild overall implications, the ALJ was required to look at the circumstances to decide whether the grid could be applied.  In cases where a nonexertional impairment "significantly affects claimant's ability to perform the full range of jobs" she is otherwise exertionally capable of performing, *Lugo v. Sec'y of Health & Human Servs.*, 794 F.2d 14, 17 (1st Cir. 1986), "the Secretary must carry his burden of proving the availability of jobs in the national economy by other means," *Gagnon* v. *Sec'y of Health & Human Serv.*, 666 F.2d

662, 665 (1st Cir. 1981), typically through the use of a vocational expert. *See, e.g., Burkhart* v. *Bowen*, 856 F.2d 1335, 1340-41 (9th Cir. 1988); *Burgos Lopez* v. *Sec'y of Health & Human Servs.*, 747 F.2d 37, 42 (1st Cir. 1984); *Sherwin* v. *Sec'y of Health & Human Servs.*, 685 F.2d 1, 3 (1st Cir. 1982); *Ortiz*, 890 F.2d at 524.

In this case, the vocational expert determined that Ms. Ortiz could perform sedentary work such as the function of a telephone operator, telemarketer or surveillance system monitor. For none of these jobs would any of her postural limitations or non-exertional limitations be significant enough to have a disabling effect.  The ALJ's finding regarding residual functional capacity is supported by substantial evidence so far as it goes.

## 2.   Potential absenteeism as evidence of limitations to functional capacity

The Administrative Law Judge did not, however, adequately develop the impact of potential absenteeism of the claimant's residual functional capacity.

Ms. Ortiz argues that she "has had to be hospitalized so frequently that she would be precluded from employment just b[y] her excessive absenteeism because of her hospitalizations." Such recurrent resort to hospitals and their emergency rooms may

generate absence from available employment suggesting she cannot perform the essential functions of the jobs identified as available to her; it may also be viewed as a kind of non-verbal report of pain.  The ALJ did not discuss this contention specifically in his opinion.

To be sure, Ms. Ortiz was a frequent visitor to the emergency room, but there is no indication in the record whether all these episodic hospital visits were actually necessary. Nevertheless, it appears overall from the record that Ms. Ortiz has a number of physical ailments that caused her to see a medical professional at least several times a month.  She also visited her physician and the emergency room due to some serious ailments.  For instance, in the months following when she claims her disability began, between January and May 2010, those ailments included tendonitis[1] (January 20, 2010, with two treatment and follow-up visits), severe decompensation of diabetes[2] (March 17, 2010, again with two follow-up visits),

---

[1]  When the tendons (flexible bands of tissue that connect muscles to bones) become inflamed, irritated or suffer microscopic tears, the condition is called tendonitis.
[2] Decompensated diabetes mellitus is a disease in which blood sugar levels cannot be corrected by means of drugs and which will, over time, result in severe damage to many of the patient's systems and internal organs.

development of an abscess[3] and gout[4] (April 21, 2010) following the treatment of severe pain in her shoulders by her physician one week earlier, major depressive disorder[5] (April 27, 2010), nausea and vomiting (April 28, 2010), chest pain (April 29, 2010), pain in her feet (May 23, 2010) and gastritis[6] a few days after that.

On all accounts her condition seems to have worsened over the years, from when she was still able to drive herself in April 2010 to being unable to care for herself properly as she testified at trial.

While questioning the vocational expert during the hearing, Ms. Ortiz's counsel asked: "If an individual was off task

---

[3] An abscess is a typically painful localized collection of pus that generally develops in response to infection or to the presence of other foreign materials under the skin that often needs to be lanced through incision and drainage by a health-care provider.

[4] Gout is a kind of arthritis which can cause attacks of sudden burning pain, stiffness, and swelling in a joint, that usually continue to occur until the gout is treated and can harm the patient's joints, tendons, and other tissues if left untreated.

[5] Major depressive disorder causes most people to either have depressed mood and/or a general loss of interest in activities they once enjoyed, and might cause other physical and mental symptoms such as fatigue, difficulty with concentration and memory, feelings of hopelessness and helplessness, headaches, body aches, and thoughts of suicide.

[6] Gastritis is an inflammation of the stomach lining which can, in some cases, lead to the stomach lining being eaten away, resulting in sores (peptic ulcers) in the stomach or first part of the small intestine.

between 15 percent and 20 percent of the time, how would that impact the vocational base?" The vocational expert testified that the individual would not be able to do the work under these circumstances. He clarified that his assessment that Ms. Ortiz was able to perform sedentary work was only valid under the hypothetical limitations provided to him by the ALJ without considering her own description of her limitations. In his opinion, the ALJ explicitly mentioned and alluded to some of her limitations, but did not examine the potential effects of absenteeism on Ms. Ortiz's ability to work.

There has been relatively little guidance on this issue in the case law. Insight may be gained by examining the guidelines for the circumstances in which employers are allowed to dismiss an employee claiming to be disabled. In this connection, the First Circuit has observed:

> where it is unrealistic to expect to obtain someone to perform those essential functions temporarily until the sick employee returns, the employer may be entitled to discharge the ill employee and hire someone else. An exception to this might be if the requested disability leave was so brief that no undue business harm could reasonably be expected to occur from not filling the vacancy.

*Garcia-Ayala* v. *Lederle Parenterals, Inc.,* 212 F.3d 638, 650 (1st Cir. 2000).

The First Circuit in *Garcia-Ayala* went on to explain that if retaining the employee "place[d] the employer in a hardship situation" the employer might be allowed to dismiss the employee, and that "where it is unrealistic to expect to obtain someone to perform those essential functions temporarily until the sick employee returns, the employer may be entitled to discharge the ill employee and hire someone else." *Id.*

The First Circuit similarly observed in a case where the plaintiff had been a clerk typist before the onset of her mental health problems that:

> [i]n order to be considered mentally capable of performing any type of work, a claimant must be able to cope with certain demands.  These demands include "the need to be punctual and to attend work on a regular basis, the ability to accept supervision and the capacity to remain in the work place for an entire day." It certainly is arguable that someone who, at times, cannot leave her home due to her depression also is incapable of being punctual and attending work on a regular basis.

*Roberts*, 67 F. App'x at 622 (*citing Irlanda Ortiz* v. *Secretary of Health & Human Servs.*, 955 F.2d 765, 770 (1st Cir. 1991)).

Ms. Ortiz frequently chose to go to the hospital for symptoms of uncertain etiology.  While she often remained for only short periods of time ranging from several hours to overnight stays, such frequent unforeseen absences could make it next to impossible for the employer to find suitable

replacements in order to continue an uninterrupted flow of his business.  The employment areas found to be suitable to her abilities by the vocational expert (a telephone operator, a telemarketer, or a surveillance system monitor) require the employee to be at her desk during the allocated shifts. Especially for employment in these areas the employer must be able to depend on the punctuality and reliability of his employees.

The record is inadequately developed on this issue.  It is impossible to determine on this record — in the absence of more particularized findings and conclusions by the Administrative Law Judge — whether absenteeism would make the identified employment possibilities as a practical matter unavailable.  I will remand for further hearing to develop the record on the impact of absenteeism.

### B.  *Evaluating Pain*

Ms. Ortiz also undertakes to develop specific claims that the ALJ's finding with respect to her reports of pain were flawed.  In this Ms. Ortiz contends that the ALJ did not sufficiently take into account several aspects of her subjective reports of pain that should have influenced his evaluation of her residual functional capacity.

31

Ms. Ortiz argues that the ALJ failed to consider adequately and apply properly the required factors for assessment of the credibility of subjective accounts of pain.  Courts have consistently recognized that "[p]ain can constitute a significant non-exertional impairment which precludes naked application of the Grid and requires use of a vocational expert." *Nguyen*, 172 F.3d at 36 (*citing Heggarty* v. *Sullivan*, 947 F.2d 990, 995 (1st Cir. 1991)); *Burgos Lopez*, 747 F.2d at 41-42; *Gagnon*, 666 F.2d at 664, 666.

Determination of intensity of pain is important here because it can significantly affect evaluation of a claimant's ability to sit or stand for several hours.  This is especially so if the claimant has been found to be able only to perform work at the sedentary level which mostly involves sitting over a long period of time.  "The inability to remain seated may constitute an exertional impairment which significantly erodes the occupational base for sedentary work and requires use of additional vocational resources." *Nguyen*, 172 F.3d at 36 (*citing Rose* v. *Shalala*, 34 F.3d 13, 19 (1st Cir.1994)); 61 Fed. Reg. 34478 (July 2, 1996).

The Social Security Disability Benefits Reform Act of 1984 provides that a claimant's statement as to his pain "shall not alone be conclusive evidence of disability" and requires that

"there must be medical signs and findings, established by
medically acceptable clinical or laboratory diagnostic
techniques, which show the existence of a medical impairment
which could reasonably be expected to produce the pain alleged."
42 U.S.C. § 423(d)(5)(A).  It then states that disability is
established if such findings "when considered with all evidence
(including statements of the individual or his physician as to
the intensity and persistence of such pain which may reasonably
be accepted as consistent with the medical signs and findings),
would lead to a conclusion that the individual is under a
disability."  *Id.*  In other words, the Act makes clear that a
necessary requirement for considering pain in the determination
of a claimant's disability is that there must be a clinically
determinable medical impairment that can reasonably be expected
to produce the pain alleged.  *Avery* v. *Sec'y of Health & Human
Servs.*, 797 F.2d 19, 21 (1st Cir. 1986).  The First Circuit in
*Avery* makes clear that "so long as statements of a claimant or
his doctor are not inconsistent with the objective findings,
they could, if found credible by the adjudicator, permit a
finding of disability where the medical findings alone would
not."  *Id.*  In this connection, the ALJ is required to examine
the full description of the claimant's prior work record, her

33

daily activities and any additional statements made by the
claimant or her treating physician.  *Id.* at 23.

The claimant's own statements, if consistent with the
medically established record, can be valuable in determining in
how far a claimant's abilities to cope with the demands of a
regular work rhythm are affected by the symptoms of her disease.
Pain is subjective, thus the existence of pain and the extent to
which this pain affects the claimant's ability to work are
difficult to evaluate objectively.  *Id.* at 24.  Courts have
recognized the principle "that a person's symptoms may be more
severe than the objective medical evidence suggests.  Therefore,
the regulations provide six factors that will be considered when
the applicant alleges pain," or other symptoms.  *Makuch* v.
*Halter*, 170 F.Supp.2d 117, 126 (D. Mass. 2001) (internal
punctuation, emphasis, and citation omitted).

These six Avery factors for determination of intensity of
pain and the extent of their effect on the claimant are (1) the
nature, location, onset, duration, frequency, radiation and
intensity of any pain, (2) precipitating and aggravating factors
(e.g. movement, activity and environmental condition), (3) pain
medication, (4) treatment, other than medication, for relief of
pain, (5) functional restrictions, and (6) the claimant's daily
activities. *Avery*, 797 F.23d at 29.

The ALJ in this case only explicitly considered factor six in his opinion, as described above, but he implicitly alluded to certain other factors.  For example, he referenced to Ms. Ortiz's functional restrictions, the assessments of her residual functional capacity provided by Dr. Poirier, Dr. Faigel, Dr. Cox and Dr. Garrison and her orthopedic treatment consisting of one steroid injection.

As described above, Ms. Ortiz's daily activities seem to suggest that she is capable of handling the demands of living by herself.  Of course, the courts have recognized in the *Avery* line of cases that pain can have an additional limiting effect when it leads to a greater expenditure of energy even for seemingly simple tasks which could potentially make work and taking care of daily needs while living alone incompatible.

The record shows that Ms. Ortiz self-reported that she was taking Ibuprofen and Percocet every 4-6 hours to combat her pain.  These medications had both been prescribed to her by her treating physician Dr. Christiano.  Both medications are pain relievers and Percocet is classified as a narcotic due to its strength.

While the ALJ must consider each of the factors, there is no requirement of specific findings as to each of the factors being expressed in the written decision.  *Escobar* , 2014 WL

35

1159822, at *16; *see* 20 C.F.R. § 404.1529(c)(3) (listing *Avery*
factors as factors that the Commissioner "will consider" in
evaluating subjective complaints of pain and other symptoms);
*Rand* v. *Barnhart*, 357 F.Supp.2d 361, 368 (D. Mass. 2005) ("While
it may be argued that it would have been more helpful for the
hearing officer explicitly to outline the *Avery* factors in
making his credibility determination, it is sufficiently clear
from the record that he thoroughly questioned [the claimant]
according to those guidelines at the hearing."). As these cases
show, the ALJ does not have to follow a script in considering
the six factors one by one explicitly, although there has to be
some indication that the ALJ took all the *Avery* factors into
consideration. After full review of the record, I am satisfied
that is the case here.

The ALJ explained he used a two-step process, first to
determine "whether there is an underlying medically determinable
physical or mental impairment(s) that could reasonably be
expected to produce the claimant's pain or other symptoms," and
second to evaluate "the intensity, persistence, and limiting
effects of the claimant's symptoms." Following these steps the
ALJ somewhat conclusorily stated that while he found the
claimant generally to be a "sincere witness," he did not find
"her testimony [to] establish a disabling level of limitations

given the objective record." He noted in this regard her various reports of medical problems were not followed up with pursuit of treatment regimens evidencing continued disabling conditions needing systematic and continuing remediation. I conclude that the *Avery* protocols for evaluation of subjective reports of pain were adequately followed.

### III. CONCLUSION

For the reasons set forth more fully above, finding the record incompletely developed expressly to determine whether Ms. Ortiz's potential for absenteeism would affect her ability to perform the identified jobs, I hereby REMAND this matter to the Commissioner for further hearing and express findings on the absenteeism issue.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE